nfer argument is Vanacore v. Expedite Video Conferencing, 183246. Good morning. Just for a minute until the gallery is empty. You seem to be losing your audience. Sorry to see that. Wouldn't be the first time. All right. You can proceed. Good morning, Your Honors. May it please the Court, my name is Paul Williams. I represent the appellants in this case, Expedite Video Conferencing Services, which was the employer of the plaintiff, and Larry Rohr, who was the majority shareholder and the president of Expedite. The primary issue on this appeal, we believe, concerns the enforceability of a particular term of the employer's sales incentive bonus plan. We don't think there was any dispute, certainly after the conclusion of the trial, that the plaintiff knew about this particular term almost immediately after the adoption of the plan. He admitted on his cross-examination and I believe his direct testimony that by December 2009, he was specifically told that there would be a 2 percent, a deduction from his commissionable base of equal to 2 percent of his total sales figure. We're on clear error review, right? I beg your pardon? What's your standard of review for this factual finding? We believe it's de novo review. We're not, I don't believe there's any fight over what the factual findings were. We believe the dispute is what the court did with those findings, and the legal conclusion the court drew from them. The law in the State of New York is very clear, that if you are aware of a term of your employment and you're an at-will employee and you continue your employment, you've been deemed to accept that particular term. But didn't the, please go ahead. What you just said, at what point does the acceptance occur? I believe the acceptance in this case occurred in December of 2009, within 3 months of the adoption of the plan, when the plaintiff admitted he was specifically told of the 2 percent deduction. He sent an e-mail on that around December 10th saying, you're kidding me about the freight. And he admitted on his cross-examination. He objected to it. He objected to it, but he never quit. He objected to it for 4 years. There's no doubt about that. So what is the act that is acceptance, in your argument? It's continuing his employment with the company with knowledge of the particular term. He objects, but then he doesn't quit. And not quitting is the acceptance? Not quitting is the acceptance under New York law. Yes. So the magistrate judge, though, said that as a factual matter, the record is sufficiently ambiguous on this issue. There's no clear point which could be said to represent acceptance or an agreement by the parties, because they kept on discussing and debating what were the 2 percent. Well, and that's where we believe the courts. Why it was fair, why it wasn't, and so on. That's where we believe the court made its first major error. What the court said was the topic was, quote, continually under discussion and reconsideration of the parties, between the parties. Isn't that a factual finding that we would have to defer? No, because we don't dispute. The court, in making that conclusion, referred to a section of the plaintiff's brief, which referred to a number of e-mails between the plaintiff and two fellow employees, Kieran Kelkar and a guy named Thomas Talley. We don't dispute that those communications took place, but it's the legal conclusion. The court basically imputed those discussions with fellow employees of the plaintiff to negotiations on behalf of Expedite. Those persons were not authorized representatives of the corporation. The testimony at the trial was very clear. The officers of this corporation were Larry Rohr, John Jenner, and for a time a man named Bruce Saunders. Bruce Saunders was the man who communicated with the plaintiff in December of 2009 and told him about the 2 percent deduction. I mean, if the plaintiff was talking to the janitor, I mean, would that constitute a renegotiation? We don't believe so. What would you say then was the last communication between Mr. Van de Koor and management that set out the terms such that his continued employment there, of his failure to quit, was an acceptance? We think the communications took many forms. There were e-mails between him and John Jenner where he complained about the 2 percent deduction, and John Jenner said, this is a subject that was discussed. You were there for the discussions. It might work unfairness in certain situations. I think what happened here was the plaintiff in this case had a number of customers who lived or resided outside of the State of New York. So for those particular customers, the cost that the company bore for, let's say, delivery men, delivery vehicles, they weren't used for some of his sales because they were going out of State. But that doesn't mean a corporation has to have a separate bonus program depending on where a customer resides. How large was the management group? It was three persons and then down to two once Bruce Sanders actually passed away. So it's a closely held company with 25 employees. Yeah. So it's not quite so unreasonable to look at the continued objections raised by Mr. Van de Koor over time as communicating with the company. But all of his communications with either Larry Rohr or John Jenner wound up they never varied in their response to him. They never changed their commission calculation. Every year he got a commission report from the company. The company always applied the 2 percent deduction. There is not a single item in this record in which Mr. Rohr or Mr. Jenner equivocated on the subject. The plaintiff admitted at trial. What if they had? I'm sorry? What if they had, hypothetically? What if they had equivocated? What if they said, well, I don't know, you may have a point. We'll revisit it down the road. Then what? Depending on what they were referring to with the point. But if they said. What they're referring to. We're talking about the 2 percent. It depends if they did revisit it and what they said down the road. I mean, don't forget there was a written plan. The written plan. You're saying that even if they said, you may have a point. We'll revisit it down the road. Continuing to work. That is, continuing to work means that in an at-will capacity means you're working at the terms set by the employer. That's our position, yes. Even if the employer is willing to discuss them. I'm sorry, I didn't hear. Even if the employer is willing to discuss them. Willing to discuss does not constitute a renegotiation. Perhaps if they were going to discuss it a future date, it would depend on what they discussed and what they agreed to at that future date. So there was a March 5, 2012 email from Jenna to Mr. Vandercort that says, I recall your point, especially as it relates to services. I believe Larry said we could discuss the difference once all the numbers were in line and if need be, work something out. Once we have a clear picture, we can discuss as well as cost, not listing the jobs. Doesn't that demonstrate continued discussion? I don't believe so. It was a statement that at some point they would address it. They never did. The company never changed its position. It never altered. But the substance of the email is we'll talk about this once we have all the numbers. They didn't have all the numbers then. Doesn't that invite continued employment subject to a later resolution? We don't believe so. They never had a specific discussion changing the term that had been communicated to the plaintiff and that he had been working under. That was 2012. By 2012, he had received annual reports for 2009, 2010, 2011, all showing the 2% deduction. By 2012, the company's fortunes had changed. By the end of 2013, sales were down. I believe a plaintiff's own damage analysis shows that he was overpaid his commissions for 2012 and 2013. So by 2012, the main issue had passed. With regard, before the red light's on, but before you sit down, so there is an issue on damages about a sale to Johns Hopkins that never occurred? Yes. Our client testified at trial that there was a particular sale included in the plaintiff's calculation of his commissions for the year 2011 of $417,000, which was canceled. The customer contacted the company, advised that it was not ready to take delivery and it canceled the order. He testified to that. There was no rebuttal testimony really offered at trial. And the lower court just ignored the issue, just adopted the plaintiff's damage calculation. We think that was error. We think that should really be remanded for further consideration by the court. Is a remand necessary or is that something that can be just struck from the damage award if we want to? Well, as it was not, I believe it can be struck from the damage award because it wasn't really rebutted. The testimony wasn't rebutted. Well, we'll hear from your adversary then about that. Okay. Okay. Thank you very much. You have two minutes of rebuttal. Thank you. Okay. Mr. Abelove. May it please the Court. My name is Jason Abelove. I represent the plaintiff, Appelli Stephen Vanacourt. I believe that where the plaintiff's argument fails is there was a commission plan in place that the court found, the plaintiff proffered and the court found, and that commission plan did not have any kind of a 2 percent adjustment. It said that we were going to adjust for unbilled freight. So the plaintiff has to the ‑‑ pardon me, the defendant has to show that the plan was amended. And at the end of the evidence ‑‑ Did it say how you were going to adjust for unbilled freight? 2 percent is a way to adjust for unbilled freight, isn't it? No. It said the actual freight incurred, this is on page 305 of the appendix, it said that management reserves the right to charge back any returns, unbilled shipping charges, and any other expenses that have not been accounted for. So on the face of the ‑‑ Well, you added the word actual a moment ago. But the word actual is not in what you read. So why don't we get down to what the words are. Okay. We're dealing with a contract here. All right? You can't make it up as you're standing. I didn't believe I was making it up. You said actual. Actual is, you know, the actual shipping charges means they'd have to calculate the shipping charges with respect to every delivery. Correct. And my client went ahead and did that for them. But the contract pulled for unbilled shipping charges. It didn't say we were going to do an arbitrary 2 percent reduction. Unbilled means you don't have a bill for it. Meaning these are expenses that the company incurred that they did not bill the client for. Right. Not that the company didn't know what the expenses were. Yeah. And, again, those were pretty easy to track. And my client, in fact, did that. Let me ask you this question. Let's say that the plaintiff was working for the company. Your client was working for the company for two months. And they're arguing about whether it's 2 percent or not. He continues working for another 20 years. He remains disgruntled. He gets a gold watch. And he leaves. Is there any point at which he became an at-will employee? Well, he was always an at-will employee. I don't know if there was a point where he accepted the 2 percent. The issue in this case was there was only six commission statements given to him. Well, he was an at-will employee, but you're saying that there never was a point. I mean, there are a lot of people who are disgruntled employees. If you ask most people, they don't think they're getting sufficient payment for what they're doing. Many of them are right. But that's not a basic contract. At this point, he was told it was going to be 20 percent, and they never backed off it. And he continued to work. This is New York law. I mean, it's not federal law. I respectfully disagree. I think what we charted is every time they mentioned the 2 percent, he said, hey, that's not the plan. And then they came back and said, let's talk about it. And it wasn't, as Mr. Williams tried to represent, the janitor that he was talking to. He was talking to the five separate controllers that were there over five years. And each time, the controller said, hey, you make a point. And there are internal e-mails between Mr. Did the controller have the authority, really, to bind the company? Well, the controller was the only one that was speaking to him. Mr. Rohr was ignoring his e-mails. And the controller was the one that was figuring out what the commission dollars were. The controller was the one that was sending the reports. Did the controller have the authority to bind the company? That's a different question. The controller did have the right to bind the company in the sense that there was a written commission plan, and the defendant is saying it's the controller that communicated the amendment to the plan. There was never a separate issue. So the 2 percent deduction was on every commission report, right? No. It was not? No. It was not on the first two in 2009, did not. Since June 2011, I guess. Right. So 9 and 10, right. So then in 2011. And then my client said, I don't know what you're talking about. What 2 percent? And they said, oh, we'll look into it. And they worked with him. And he got the actual commission dollars. And he sat down with the controllers. No one ever said you have to accept this 2 percent amendment to the plan in order to keep working here. I thought you just said that when he sent repeated messages to his boss, they were ignored. No. They said that they will look at it, they will work on it, and they continued to work on the dollars. I thought you said that the controller said we'll look at it, but that the Mr. Rohrer just ignored them. At the end of my client's employment, when he was after working with the fifth controller and coming up with the right commissions pursuant to the plan, when no one ever said if you don't accept the 2 percent, you can't continue to work here, ever. That's interesting. My question is this. You said he sent repeated messages or e-mails, I think to Mr. Rohrer, and then you said he ignored them. At the end of 2014, at the end of his employment, after working with the fifth controller, he said this is what we figured out the commission dollars are, and he sent that to Mr. Rohrer. Mr. Rohrer did not respond to either of those e-mails, and then my client's employment was terminated following that. So it was the final two e-mails in 2014. Before that, he was working with who the company represented for him to work on his commissions with. And with respect to the authority issue, my brief shows all over the place that Mr. Rohrer is in on these e-mails. He's copied on these e-mails, and nowhere does he say what are you negotiating with this guy for? We amended this plan for the 2 percent. They're saying we think it's unfair. It's service contracts. There is no freight, or the client has been billed for the freight within the bill. It wasn't an unbilled shipping charge. And nowhere does Mr. Rohrer say, hey, stop it. We amended the plan. It doesn't exist anywhere until trial, where they try to say, well, we communicated that with him. And they don't call any of the individuals that they claim communicated the 2 percent amendment to my client. Nobody testified to it anywhere in the trial. But do you contest that it happened? I think that in the plan, when he got the commissions, all of a sudden there was a flat 2 percent deduction. And the company, because they were only giving him statements instead of monthly, once a year, it became problematic for them to go back five years or four years to look at all the commission statements. So they did this flat 2 percent. And my client said, hey, that's not fair. And at every point they said, you're right, we agree it's not fair. We'll look into it. We'll talk to Larry. We'll figure it out. And my client, they asked my client to give them information. Who said we agree it is unfair? We. Somebody is speaking for the company. We agree that it is unfair. Okay. Well, as Your Honor pointed out, as late as March of 2012, a person, John Jenna, whom Mr. Williams admits was an officer of the company, talks about the initial commission plan. And by the way, just Mr. Rohr admitted under oath at trial that the commission  So, you know, with that in the spectrum. And he says, I do recall your point, especially as it relates to service, and believe Larry, Mr. Rohr, said we could discuss the difference once all the numbers were in line and, if need be, work out something. Once we have a clear picture, we can discuss, as well as costs not listed in the job. Is that a contract? Is that a contract, Your Honor? Well, I think what belies Speaking as a New York lawyer. No, that's not a contract. That's not a contract. But we do have a contract, and it belies the defendant's argument that the contract was amended. That's that they're trying to say that the contract was amended. And that certainly wasn't done in writing. It certainly nobody testified. It was communicated to my client. And when my client objected to the commission reports, they say we're going to look into it. There was no clear amendment ever made to this contract. I see that my time is up. Actually, you have until the red light comes on. And I have a final question for you, which is about the Hopkins, the Hopkins sale that was apparently not consummated and that your adversary claims was erroneously included in the damages award, and that there was no rebuttal to that claim. What's your position on that? There was no document. Mr. Rohr made an oral statement at trial that this was canceled. He produced no documentary evidence, no bills, no anything. It was never mentioned in discovery. He didn't talk about it in his deposition. At trial, it was an afterthought, and it so lacked any specificity or backup. If an order was canceled, there would be a document that it was canceled, that the court correctly, factually determined that to be inaccurate. The magistrate judge actually spoke to that directly and said there was inadequate proof of cancellation? Well, the magistrate said that there were minor — I don't have his exact language, but he said there were minor disputes in terms of the dollar figures, and I believe he justifiably ignored that. I don't think he specifically wrote in his order that he was ignoring it. But it was literally backed up by nothing and, again, never talked about before trial, not at depositions, not at discovery. And he didn't have any cancellation order. He didn't have a document or a check that went back, nothing like that. So I believe that there was just so little evidence to support that bald assertion made for the first time at trial that the magistrate justifiably ignored it. So I'm looking at the magistrate judge's findings of fact and conclusions of law on A13. Could you point to me where there's any finding about this? I'm just finding plaintiffs entitled to liquidated damages, and that's 100 percent true. I'm not seeing any discussion directly of the Hopkins, and I was concerned about the cancellation, because that was a significant amount. It was a $417,000 sale, I think. Your Honor, I just don't have that flag. I apologize. But you believe the magistrate judge addressed that specifically? No, I don't believe he addressed it specifically. He justifiably ignored it because it was just a kind of bald assertion without any kind of backup made for the first time at trial. So there was testimony saying there was cancellation, but it was not supported by documents, and so you think the magistrate judge was justified in ignoring the assertion? Correct. And it was never made in discovery. All right. Thank you very much. Mr. Williams, you have 2 minutes of rebuttal. Thank you, Your Honor. On the last point concerning the cancellation of the Johns Hopkins sale, it's not true that it was sprung at the last minute without any backup. Mr. Rohr testified, and it's appendix pages 162 and 163, very specifically that the order was canceled. He referred to the commission report for that year. Was there any documentation? Yes. He referred to the 2011 commission report. There was a column at the very end of the report which included, for most orders, a P, which means the company had been paid for the order. He pointed out in his testimony that there was no P next to the Johns Hopkins sale. They were never paid for that order. And the commission plan itself stated specifically that commissions would not be paid, would not earn until the company actually received payment from the client. Would that mean that just as of the time the report was prepared, they hadn't been paid? That strikes me as a little different from the order was canceled. No. The report was prepared in March of 2012. So this was a 2011 commission report, referring to a sale that I believe took place in February of 2011. So certainly by the end, by a year later, they had the information to confirm that there was no payment on that sale at any point in time in 2011. Did the magistrate judge address it specifically? Not at all. I don't believe the judge addressed it at all. Okay. Thank you very much. To go to the other subject, can I understand that he was, that the plaintiff was hired with the understanding that he would get a commission that would be adjusted for unbilled shipping? Is that, was that the contract term? He would be paid a commission that would be adjusted for unbilled shipping. Unbilled shipping and related costs. Of course, he was hired long before the plan was adopted. He was hired in 2002. All right. But when the plan was put into effect. Correct. That was the term, correct? That was the term in the writing. That's correct. Okay. Now, he says that he worked under that term and that there, therefore, was, then the disagreement arose as to whether that term meant a flat adjusted rate as you're, as the, as the employer took the position or that it, it meant an actual worked out dollars and cents figure, correct? Correct. When was that, when was that dispute resolved from the point of view of the employer's understanding? He admitted during his testimony trial that by the time of his December 10th, 2009 email that said, you're kidding about the freight, that he had been specifically told of the 2% deduction. So we claim. Was he told that that was the position of the company? Yes. And he continued to complain about it, but he never quit. 2010, 2011, 2012, 2013, he never quit. He complained, but he didn't quit. He says he never quit because there was, it was an open item and they were going to, and, and they, the employer said, well, we'll work about, we'll, we'll work around it. We'll think about it. We'll adjust it. We'll, you know, it's an open item. He can't point to any actual communications to that effect with the people who mattered being the officers of the company. His entire theory of his claim against Larry Rohr is that Larry was the guy who made the decisions. He was, he was the man. Larry never varied on that particular point, and he never had a conversation with Larry or John in which they said, okay, well, we're going to withdraw this and we'll do something else. That never happened. Okay. Thank you very much. Thank you. We'll take the matter under advisement.